**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

KELLY E. MILANO,

       Plaintiff,

v.                                           CV 08-0823 WPL

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

**ORDER GRANTING MOTION TO REVERSE AND REMAND**

Kelly Milano applied for Social Security Disability Insurance and Supplemental Security Income benefits on May 2, 2005. After an adverse decision by the Commissioner of Social Security, Ms. Milano brought this action for judicial review. The matter is before me now on her Motion to Reverse and Remand the Commissioner's decision. In her Motion, Ms. Milano argues that the Administrative Law Judge (ALJ) erred by failing to include all of her physical impairments in his residual functional capacity (RFC) finding and erred in his assessment of her mental impairments.

**FACTUAL AND PROCEDURAL BACKGROUND**

Ms. Milano alleges a disability onset date of April 4, 2005. (AR 75, 78.)[1] The Administration denied her application for DIB and SSI benefits at both the initial and reconsideration levels. (31-34.) On November 10, 2005, she filed a request for a hearing before an ALJ. (63.) On October 24, 2007, ALJ George W. Reyes held a hearing on her application for benefits. (6.) Ms. Milano testified at the hearing and was represented by counsel. (*Id.*) The ALJ denied her claim for benefits and the Appeals Counsel denied her subsequent request for review. (1.)

---

[1] Unless otherwise noted, all numbers in parentheses refer to pages in the administrative record.

Ms. Milano was 36 years old when she filed her application and 38 years old when the ALJ issued his decision that became the final decision of the Commissioner. (46.) She is a high school graduate and is certified as a nurse's aide. (9, 116.) Before the alleged onset of disability in April 2005, Ms. Milano worked as a certified nurse's aide, microfilm clerk, home health aide, and chef's assistant.[2] (98-104, 112-13, 170.) After losing her job as a nurse's aide in April 2005, she worked part-time for several months doing prep work at a pizza restaurant until she was fired for frequent absences. (11, 150, 170, 308.) Ms. Milano claims that she is unable to work due to major depression, chronic post traumatic stress disorder (PTSD), fibromyalgia, arthritis, back pain, and problems with her right hip, knee and ankle and both feet. (6-30, 111.)

### History of Physical Complaints

A voluminous medical record chronicles Ms. Milano's history of physical and mental health complaints since the death of her second husband in April 2004. The first record on file is from a visit to her primary care provider, First Choice, on August 27, 2004. At this visit, Ms. Milano reported significant weight loss since the death of her husband, flashbacks to childhood abuse, loss of appetite, and constant crying. (202.) She also complained of body aches, and leg and back pain. (*Id.*) The nurse practitioner, Carmella Mondragon, assessed depression, weight loss and suicidality and referred her to the UNM Mental Health Clinic. (*Id.*) Ms. Milano's subsequent visits to both her primary care provider and the emergency room indicate frequent complaints of body pain, particularly in her lower back, and right hip, leg, ankle, knee and foot.

For example, on October 15, 2004, she complained of right groin pain and right hip pain

---

[2] Ms. Milano's work history report lists this job title as "cheif assit. [sic]" and the type of business as "job training." (98.) The ALJ interpreted this position as an "assistant job trainer." (46.) Later in the work history report, Ms. Milano provides further information regarding her job as "cheif assist. [sic]," stating that she "did the cooking, baking and cleaning." (104.) I interpret this position as a chef's assistant.

radiating laterally down her leg to her knee. (194.) Ms. Mondragon observed mild swelling across the top of her right ankle and tender points in her "occiput, inner elbows, knees and ankles" and assessed her with depression, right hip pain and symptoms of fibromyalgia. (*Id.*) She ordered an x-ray of Ms. Milano's right hip and prescribed ibuprofen for the pain. (*Id.*) The x-ray was "radiographically normal" but the radiologist noted that this "does not rule out a soft tissue problem such as a bursitis or synovitis." (95.) On October 25, 2004, Ms. Milano again complained of right hip pain and right leg pain of ten on a scale of one to ten. (190.) She reported numbness in her right leg and that her "leg gives out." (*Id.*) Ms. Mondragon ordered an arthritis profile and a lumbar spine (LS) x-ray, gave her a physical therapy referral, and prescribed Neurontin for the pain.[3] (*Id.*) After reviewing the results of the arthritis profile, Ms. Mondragon noted that no action was needed. (193.) The spinal x-ray indicated "mild spondylosis deformans and sclerosis of the anterior superior endplates of L2-L4." (191.) At a follow-up visit in December 2004, Ms. Milano complained of right hip pain and pain in her right wrist. (189.) Ms. Mondragon prescribed a wrist splint, elevation and ibuprofen for the pain. (*Id.*)

In 2005 Ms. Milano sought treatment for pain in her lower back and right leg in April, May, June, September, October, and November. Notably, on April 14, 2005, Ms. Milano reported that several weeks earlier she rear-ended another vehicle when she was unable to move her right leg from the gas pedal. (182.) Ms. Mondragon noted "out of Neurontin + Ibuprofen but they're not helping pain much per pt. LB radiates rt gluteus and hip. Good + bad days." (*Id.*) The nurse practitioner ordered a LS MRI that was essentially normal but indicated "mild facet ligamentum flavum hypertrophic changes at L4-5 and L5-S1." (182, 177.) On May 31, 2005, Ms. Milano reported

---

[3] Later, at a visit in June 2005, Ms. Milano reported seeing a physical therapist the year before but there are no PT records in the file. (*See* 175.)

"cont. to have LB-Rt gluteous + lateral Rt. leg pain, pain bilat. feet.  Worse w/ standing for prolonged time periods." (179.)  Ms. Mondragon ordered an HLA B$_{27}$ which was negative.  (179-181.)  On June 15, 2005, Ms. Milano sought treatment for back and body pain.  (175.)  She reported muscle cramps in her right leg and pain in her left upper back and shoulder.  (*Id.*)  Ms. Mondragon observed tenderness along pressure points "occiput scapula medial + lateral [illegible], inner knees, ankles, sternum" and assessed Ms. Milano with "Fibromyalgia, back pain, Rt radiculopathy, [illegible] depression, PTSD, osteoarthritis, migraines." (*Id.*)  She referred Ms. Milano to the rheumatology clinic and the pain clinic.  (*Id.*)  The rheumatologist noted "tenderness on palpitation of the right second PIP, MP joint of the right thumb and both wrists" and "some crepitus with rotation of the right shoulder."  (269.)  He also felt that "until some of her psychological problems are dealt with, there is very little chance that any medication is likely to provide long-lasting or significant relief."  (270.)  In October 2005, Ms. Milano visited the emergency room complaining of right hip, knee and ankle pain exacerbated by a fall.  (239.)  The ER doctor noted "tenderness to palpitation over the greater trochanter of the right hip" and some tenderness "along the lateral aspect of the right thigh and at the thigh."  (*Id.*)  He prescribed a "cane or walker until the pain resolves." (245.)  At a follow-up appointment with a new primary care provider, Ms. Milano complained of arm pain from the fall.  (354.)  An x-ray of her right humerus did not show any fracture.  (356.)  In November 2005, Ms. Milano reported experiencing pain in her right forefoot for the previous two months.  (352.)  The physician's assistant suggested a referral to podiatry.  (*Id.*)  On December 12, 2005, Ms. Milano saw Dr. Frame, a podiatrist, regarding the pain in her right foot.  (236.)

The medical records indicate that Dr. Frame treated Ms. Milano for pain in both of her feet during much of 2006, culminating in surgery on her right foot and ankle in July and on her left foot and ankle in November.  (*See* 371, 413.)  Although the records of Ms. Milano's early visits to Dr.

4

Frame are somewhat incomplete,[4] the first preoperative report indicates that Ms. Milano's "chief complaint [was] pain in the right foot secondary to third interspace neuroma and pain in the right ankle." (386.)  Dr. Frame diagnosed chronic synovitis and instability in her right ankle and painful third interspace neuroma in her right foot.  (370.)  He performed arthroscopic synovectomy and Brostrom type ankle stabilization on her right ankle and sinus tarsectomy and excision of the third interspace neuroma on her right foot on July 20, 2006.  (371.)  The second preoperative report indicates that Ms. Milano had excellent results with the previous procedure on her right foot but "continues to have frequent ankle sprains on the left and is interested in surgical intervention.  She has exhausted all conservative care."  (415.)   The operative note indicates that the preoperative diagnosis was "left lateral ankle instability and left sinus tarsitis."  (413.)  She underwent a left sinus tarsectomy and left Brostrom ankle stabilization on November 2, 2006.  (*Id.*)

Ms. Milano continued to complain of pain in her right hip in 2006.  On January 12, 2006, she reported aggravation of her chronic hip pain due to a motor vehicle accident.  (351.)  She complained of numbness and pain laterally from her hip radiating down her leg.  (*Id.*)  On January 24, 2006, she again sought treatment for right hip pain.  (350.)  Another LS MRI was ordered which showed "mild hypertrophy and hypertrophy of ligamentum flavum at L3-4 and L4-5 with associated

---

[4] For example, the records are sparse, contradictory, and/or missing.  The record from December 12, 2005 provides only Ms. Milano's allergies and level of pain.  (236.)  An assistant's progress notes from January 23, 2006 reflect "CC: R foot pain" but Dr. Frame's report from that same day states "returned to clinic, recheck peroneal tendinitis, left ankle . . . ."  (399, 400.)  The administrative record contains medical records for right foot injections  # 2 and # 3 (*see* 396, 394) but there is no record of injection # 1.  There is evidence of a diagnostic imaging request for "B/L ankles 3 views," but no record of the results of that imaging.  (*See* 393.)  Finally, the preoperative history and physical for her left ankle and foot indicates that Ms. Milano had exhausted conservative care (415) but the only previous record regarding her left ankle/foot is the anomalous entry from January 23, 2006, just mentioned (*see* 400).

mild central narrowing of the spinal canal." (350, 398.[5])   The last medical record in the administrative record that reflects a physical complaint is from December 2006.   Ms. Milano visited the emergency room several times in December complaining of head and tailbone pain after falling on concrete.   (402-412.)   An x-ray of her lumbar spine and pelvis revealed endplate osteophytes at L1-L2, L2-L3 and L3-L4, which were considered chronic degenerative changes, but the radiologist did not identify any significant bony abnormality.   (404.)   The administrative record contains no medical records of treatment for physical complaints in 2007.

### History of Mental Complaints

In addition to these physical complaints, Ms. Milano has sought treatment for symptoms of depression and PTSD.   She first visited the UNM Psychiatric Center (UNM) on August 27, 2004, after the nurse practitioner at First Choice assessed suicidal ideation and referred her to UNM's psychiatric emergency services (PES).   (202, 340-46.)   Until late 2005, Ms. Milano visited UNM on a regular basis.   The therapists' notes indicate that during these visits Ms. Milano reported flashbacks and nightmares relating to a long history of physical and sexual childhood abuse and domestic violence.   (*See* 313, 321-25, 338, 340.)   She also reported depression, loss of appetite, loss of sleep, frequent crying, a sense of hopelessness, difficulty concentrating, and occasional thoughts of suicide.   (*See* 313, 314, 317, 324, 328, 345.)   UNM therapists diagnosed Ms. Milano with depression and PTSD and treated her with a variety of psychotropic drugs and sleep aids including

---

[5] The record of this MRI is incomplete.   The impression states "Mild degenerative changes as above described with no clear evidence of disc herniation or significant . . . (continued)."   (398.)   The next page containing the rest of the impression is not in the administrative record.

Lexapro,[6] Trazodone,[7] Prozac,[8] Risperidone,[9] Zoloft,[10] and Wellbutrin.[11] (312, 326, 338, 345.)  They also encouraged Ms. Milano to seek therapy for her depression, grief and PTSD, which she did intermittently through the Mormon church until March 2005.  (320-21, 323, 326.)  Although she stopped getting counseling through her church, the medical records indicate that Ms. Milano continued to visit UNM until November 2005 and to fill her prescriptions until January 2006.  (*See* 305-08.)  There is no indication that Ms. Milano sought mental health care again until July 2007. On July 24, 2007, Emily Stafford, the clinical director of Health Care for the Homeless, completed a mental RFC questionnaire in support of Ms. Milano's application for disability benefits.  (426-34.) The last mental health record on file is a letter dated October 15, 2007.  (435.)  In it, Ms. Stafford indicates that she had been treating Ms. Milano for several months and for several months prior to that, Ms. Milano had been unable to purchase anti-depressants.  (*Id.*)

DISCUSSION

**Standard of Review**

In reviewing the agency's decision, I must "'determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied.'"  *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quoting *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003)).  "Substantial evidence is such relevant evidence as a reasonable

---

[6] Anti-depressant.  (169.)

[7] Sleep aid.  (169, 345.)

[8] Anti-depressant.  (325, 338.)

[9] Sleep aid, also known as Risperdal.  (169, 325.)

[10] Anti-depressant, also known as Sertraline.  (169, 323, 326.)

[11] Anti-depressant "to help w/ mood, PTSD Sx's" also known as Bupropion.  (169, 314.)

mind might accept as adequate to support a conclusion." *Id.* (internal quotations omitted). "[A] decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.* (internal quotation omitted). I must meticulously examine the record to determine whether substantial evidence supports the ALJ's decision, taking into account anything in the record that "fairly detracts" from the evidence supporting the ALJ's decision. *Id.* But I may neither "reweigh the evidence nor substitute" my discretion for that of the ALJ. *Id.* Moreover, "[t]he agency's failure to apply correct legal standards, or show us it has done so, is also grounds for reversal." *Id.*

### The Sequential Evaluation Process

"To qualify for disability benefits, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity." *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993) (citing 42 U.S.C. § 423(d)(1)(A)). The Social Security Administration employs a "five-step sequential evaluation process to determine disability." *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003). "If at any step in the process the Secretary determines that the claimant is disabled or is not disabled, the evaluation ends." *Thompson*, 987 F.2d at 1486. At step one of the process, the claimant must show that she is not working at a substantial gainful activity. At step two, the claimant must show that she has an impairment that is severe enough to significantly limit her ability to do basic work activities. At step three, the claimant must show that the impairment meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. At step four, the ALJ must determine the claimant's RFC and consider, in light of this RFC, whether the claimant retains the ability to perform work done in the past. 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4). A claimant's RFC consists of activities the claimant "can still do despite

8

[the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1); 20 C.F.R. § 416.945(a)(1).  The claimant

bears the burden of proof throughout the first four steps of the sequential evaluation process.  At step

five, however, "the burden shifts to the Secretary to show that the claimant retains the residual

functional capacity (RFC) to do other work that exists in the national economy."  *Thompson*, 987

F.2d at 1487.

### The ALJ's Decision

In this case, the ALJ concluded at step one that Ms. Milano had not engaged in substantial

gainful activity since April 4, 2005, the alleged onset of disability date, based on her earnings from

the first part of 2005 and income from a brief part-time job later in 2005.  (39.)  At step two, the ALJ

found insufficient support in the record for Ms. Milano's claim that she is affected by fibromyalgia

or her claim that she suffers from constant joint pain due to arthritis.  (41.)  However, he did find

that Ms. Milano "has medically determinable impairments, including depression, Post Traumatic

Stress Disorder, and degenerative disc disease, which . . . can be considered 'severe' within the

meaning of the Social Security Act and Regulations."  (40.)  At step three, the ALJ determined that

neither Ms. Milano's physical nor her mental impairments can be considered presumptively

disabling under 20 C.F.R. §§ 404.1520(d), 404.1525-26, 416.920(d), or 416.925-26.   (44.)

Accordingly the ALJ proceeded to assess Ms. Milano's RFC.  He found that Ms. Milano

> has the residual functional capacity for a range of light and sedentary work.
> Specifically, she is able to perform jobs that require lifting up to 20 pounds at a time,
> with frequent lifting or carrying of objects weighing up to 10 pounds; standing
> and/or walking up to two hours total during an eight hour work day; and sitting up
> to six hours total during an eight hour work day.  In spite of her mental impairments,
> Claimant is able to perform simple, routine jobs without special supervision.

(*Id.*)  Considering this RFC, the ALJ concluded that Ms. Milano was unable to perform her past

relevant work because her past jobs as job trainer,[12] microfilm clerk, home healthcare worker and nurse's aide required exertion beyond Ms. Milano's RFC.  (46.)  However, the ALJ went on to find at step five that Ms. Milano's "nonexertional mental limitations, which prevent her from performing the full range of either light or sedentary work, have little or no effect on the occupational base of unskilled light and sedentary work" and thus Ms. Milano "is able to make a satisfactory adjustment to jobs that exist in significant numbers in the national economy."  (47.)

Ms. Milano challenges the ALJ's assessment of her RFC and his treatment of her mental impairments at steps four and five.  She first argues that the ALJ erred by not including her limitations due to fibromyalgia and arthritis in his RFC finding.[13]  (Doc. 24 at 9.)  She also argues that the ALJ erred in assessing the severity of her mental impairments by faulting her for not seeking

---

[12] *See supra* note 2.

[13] In her reply brief, Ms. Milano clarifies her argument regarding the ALJ's treatment of her fibromyalgia.  She indicates that the ALJ's failure to find fibromyalgia to be a severe impairment at step two was not fatal error because he proceeded past step two.  (Doc. 27 at 2 (citing *Carpenter v. Astrue*, 537 F.3d 1264, 1265-66 (10th Cir. 2008)).)  However, she argues that his failure to "evaluate all relevant evidence to obtain a longitudinal picture of [her] overall degree of functional limitation" was reversible error.  (*Id.*)  The Tenth Circuit has stated that "once an ALJ has found that a claimant has at least one severe impairment, a failure to designate another disorder as "severe" at step two does not constitute reversible error because, under the regulations, the agency at later steps 'considers the combined effect of all of the claimant's impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.'" *Oldham v. Astrue*, 509 F.3d 1254, 1256 (10th Cir. 2007) (citing 20 C.F.R. §§ 404.1523, 416.923).  The requirement that the agency consider the combined effect of all impairments presumes that a medically determinable impairment has been found.  Thus, an erroneous determination that a claimant's complaint is not a medically determinable impairment could be reversible error, regardless of whether the ALJ proceeds past step two.  The ALJ's treatment of fibromyalgia in this case is equivocal on that point.  First, he found "[in]sufficient support in the record for Ms. Milano's claim that she is affected by fibromyalgia," suggesting that he did not consider fibromyalgia to be a medically determinable impairment.  (*See* 41.)  The ALJ then proceeded to reject Ms. Milano's claims regarding the severity of her fibromyalgia, based on his credibility determination.  Ms. Milano argues for remand due to the ALJ's failure to include limitations from fibromyalgia and arthritis in his RFC finding, i.e. to consider the combined effect of all impairments, and I base my decision on that argument.  However, to the extent that the ALJ's analysis rested on a finding that fibromyalgia was not a medically determinable impairment, nothing in this order precludes the Commissioner from returning to step two to determine first, whether fibromyalgia is a medically determinable impairment in Ms. Milano's case, and second, the severity of the impairment.  I note that the standard for severity at step two is *de minimis*.  *See Langley v. Barnhart*, 373 F.3d 1116, 1123 (10th Cir. 2004).

consistent treatment for her mental problems, by finding that medications alleviated her psychological symptoms, and by substituting his opinion that Ms. Milano's "psychological symptoms are [not] as intense or as persistent as she claims" for the expertise of the doctors who evaluated her.  (Doc. 24 at 13-15.)  Finally, Ms. Milano contends that the ALJ erroneously equated her mental impairments with functional capability to perform unskilled or simple work and further that the ALJ erroneously applied the Medical-Vocational Guidelines (the grids) conclusively without hearing testimony from a vocational expert or other vocational evidence.  (Doc. 24 at 16-17.)

### Failure to Include All Physical Impairments in the RFC Finding

The ALJ did not include limitations due to fibromyalgia and arthritis in his RFC finding because he found that Ms. Milano's claims of fibromyalgia and arthritis were not credible.  The credibility determination was based on the ALJ's finding that Ms. Milano was inconsistent in her physical complaints and tended to exaggerate her claims of pain, and on his finding that her complaints of fibromyalgia and arthritis were not supported by objective medical evidence.  (*See* 39, 40-41, 44.)

Judging credibility is "peculiarly the province" of the ALJ.  *Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990).  Nevertheless, a credibility determination must be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of a finding.  *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995).  Although I must ordinarily defer to the ALJ on questions of credibility, such deference is not an absolute rule.  *See Thompson*, 987 F.2d at 1490.  In this case, the ALJ's credibility determination was not supported by substantial evidence.

With regard to Ms. Milano's physical complaints, the ALJ found that Ms. Milano "has complained of pain and limitation in various parts of her body; but these complaints are not

consistent." (40.)  He gave as an example, Ms. Milano's alleged limitations in the use of her arms and hands noting that the medical records indicate only one occasion, in December 2004, on which she sought treatment for her hands. (40-41.)  The medical records also reflect that a rheumatologist noted "tenderness on palpitation of the right second PIP, MP joint of the right thumb and both wrists" in September 2005 (269) and that Ms. Milano again complained of arm pain in November 2005 after a fall (354).  More importantly, the ALJ appears to have ignored the consistency with which Ms. Milano complained of pain in her lower back and right hip, leg, knee, ankle and foot.  As outlined above, medical records from August, October and December of 2004, April, May, June, September, October and November of 2005, and several occasions in 2006 reflect frequent and regular complaints of pain in these areas.  Thus, the ALJ's finding that Ms. Milano has been inconsistent in her physical complaints is overwhelmed by other evidence in the record.

The ALJ's credibility assessment was also based on his determination that Ms. Milano's claims of fibromyalgia and arthritis are not supported by objective medical evidence.  With regard to fibromyalgia, he noted that, "[a]lthough [Ms. Milano] has often given health care providers a history of fibromyalgia . . . , there is no evidence in this record that she has had the work-up necessary to diagnose fibromyalgia." (41.)  In making this finding, the ALJ improperly required objective evidence of fibromyalgia, ignoring the subjective nature of the disease, and further failed to consider or discuss medical records indicating that Ms. Milano had been diagnosed with fibromyalgia.

Fibromyalgia is "'a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments and other tissue.'"  *Moore v. Barnhart*, 114 F. App'x 983, 991 (10th Cir. 2004) (citing *Benecke v. Barnhart*, 379 F.3d 587, 589 (9th Cir. 2004)).  "It is a chronic condition, causing 'long-term but variable levels of muscle and joint pain, stiffness

and fatigue.'"  *Id.*  (citing *Brosnahan v. Barnhart*, 336 F.3d 671, 672 n.1 (8th Cir. 2003)).  "The disease is 'poorly-understood within much of the medical community and . . . is diagnosed entirely on the basis of patients' reports and other symptoms.'"  *Id.*  (citing *Benecke*, 379 F.3d at 590).  As the Seventh Circuit has described:

> Its cause or causes are unknown, there is no cure, and, of greatest important to disability law, its symptoms are entirely subjective.  There are no laboratory tests for the presence or severity of fibromyalgia.  The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and-the only symptom that discriminates between it and other diseases of a rheumatic character-multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.

*Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996) (Posner, J.).  Considering the nature of the disease, the ALJ's determination that a lack of objective evidence undermined Ms. Milano's credibility was improper.  *See Gilbert v. Astrue*, 231 F. App'x 778, 784 (10th Cir. 2007) (citing *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003) (ALJ erred in "effectively requiring objective evidence for a disease that eludes such measurement")); *see also Welch v. Unum Life Ins. Co. of America*, 382 F.3d 1078, 1087 (10th Cir. 2004) (citing cases recognizing the absence of objective tests for proving the disease).

The ALJ further erred by failing to consider or discuss records indicating that Ms. Milano had been diagnosed with fibromyalgia.  The ALJ determined that Ms. Milano's claims of fibromyalgia were not supported by objective medical evidence because "where fibromyalgia is listed among Ms. Milano's medical problems in her medical records, it is based on the medical history she has provided and not clinical signs and findings associated with the disorder."  (41.) This determination is contradicted by the medical records.  The nurse practitioner at First Choice assessed Ms. Milano with depression, right hip pain and symptoms of fibromyalgia on October 15,

2004. (194.) She noted "tender points sternal, occiput, inner elbows, knees and ankles." (*Id.*) Eight

months later, on June 15, 2005, the same nurse practitioner noted "mildy anxious + depressed affect.

Good eye contact.  Tender along pressure pts - occiput, scapula medial + lateral, [illegible],

[illegible], inner knees, ankles, sternum" and diagnosed Ms. Milano with "fibromyalgia, back pain,

rt radiculopathy, depression, PTSD, osteoarthritis, [and] migraines." (175.)  There is no indication

that Ms. Milano reported fibromyalgia as part of her medical history at either of these visits prior

to the nurse practitioner's assessment.  On August 6, 2005, Dr. Gregory McCarthy performed a

Disability Determination Examination on behalf of the agency.  (222-225.)  Under "history of

present illness," Dr. McCarthy noted that "[p]atient records dated 06/15/05 indicate that the patient

has been diagnosed with back pain, fibromyalgia, right radiculopathy, post-traumatic stress,

osteoarthritis, and migraines." (222.)  The doctor then performed his own physical examination of

Ms. Milano and in his assessment stated:

> 1.   Depression.  The patient continues to exhibit signs and symptoms of depression which may not be fully adequately treated.  The patient was quite tearful during the exam and displayed pain behaviors.  The patient is not having adequate sleep despite medication - is somewhat limited in that capacity.
> 2.   Fibromyalgia.  The patient still exhibits signs and symptoms of trigger points and pain in different areas of the body, which would limit her ability to lift and carry items.
> 3.   Joint pains.  There does not appear to be any consistency on any rheumatologic basis for her pain; however, she does have pain on palpation of the medial joint line of both knees, which may be meniscal.  This would further limit her ability to squat and stand for extended periods of time.  There are no complete records to describe any rheumatologic or musculoskeletal complaints other than fibromyalgia and depression.

(224.)

The ALJ appears to have ignored these records, which indicate a diagnosis of fibromyalgia

independent of the medical history provided by Ms. Milano.  He acknowledged that "a treatment

provider noted symptoms of fibromyalgia' on [Ms. Milano's] chart" in October 2004, but did not discuss what role the diagnosis played in his findings or mention the other two occasions on which Ms. Milano was diagnosed with fibromyalgia. (41.)  While the ALJ is not required to discuss every piece of evidence, he must discuss the uncontroverted evidence he chooses not to rely on, as well as significantly probative evidence he rejects.  *Franz v. Astrue*, 509 F.3d 1299, 1303 (10th Cir. 2007).  The three assessments clearly contradict the ALJ's finding that when fibromyalgia appears in Ms. Milano's medical records it is not based on "clinical signs and findings associated with the disorder."  The ALJ's failure to consider and discuss those records is fatal to his credibility determination.[14]

Unlike fibromyalgia, arthritis can be diagnosed by objective testing.  *See, e.g., Gilbert*, 231 F. App'x at 784 (noting that it was "appropriate for the ALJ to assess the objective findings with respect to [claimant's] individual joints when considering her claims of disability based on arthritis and disc disease" but not fibromyalgia).  The ALJ noted that Ms. Milano has listed arthritis as part of her medical history since October 2005 but he found "no objective medical evidence to support the diagnosis."  (41.)  This determination is supported by substantial evidence in the record.

Over the course of Ms. Milano's visits to her primary care provider and the emergency room, medical professionals ordered various tests and imaging relevant to an arthritis diagnosis.  None of the results demonstrate that Ms. Milano suffers from arthritis.  The impression from a LS x-ray, taken in October 2004, reports "mild spondylosis deformans and sclerosis of the anterior superior endplates of L2 thru L4.  This sclerosis is sometimes seen in early ankylosing spondylitis.  No other

---

[14] On remand the Commissioner should consider the medical evidence in light of Social Security Ruling 06-03p, which clarifies "how the Commissioner considers opinions and other evidence from medical sources who are not acceptable medical sources" such as nurse practitioners.  *See Bowman v. Astrue*, 511 F.3d 1270, 1275 (10th Cir. 2008) (discussing Soc. Sec. Rul. 06-03p, 2006 WL 2329939 at *4).

signs of ankylosing spondylitis are identified." (191.) Stedman's Medical Dictionary defines ankylosing spondylitis is "arthritis of the spine." STEDMAN'S MEDICAL DICTIONARY 1678 (27th ed. 2000). An arthritis profile performed in October 2004 was negative. (193.)

On May 31, 2005, Ms. Mondragon ordered an HLA B$_{27}$, a test for antigens indicative of ankylosing spondylitis.[15] (179.) This was also negative. (180.) The impression from a LS MRI performed in June 2005 indicates "mild facet ligamentum flavum hypertrophic changes at L4-5 and L5-S1." (177.) Ligamentum flava are ligaments that bind together the laminae of adjoining vertebrae; hypertrophic change indicates an increase in bulk or size. STEDMAN'S MEDICAL DICTIONARY at 857, 1007. Another LS MRI was performed on January 30, 2006. (398.) The impression was "mild degenerative changes as above described with no clear evidence of disc herniation or significant . . . (continued)."[16] (*Id.*) The ALJ did find that Ms. Milano suffers from degenerative disc disease based on these records.

On June 15, 2005, the nurse practitioner at First Choice diagnosed Ms. Milano with osteoarthritis. (175.) However, a nurse practitioner is not an acceptable medical source for purposes of establishing a medically determinable impairment. *See* 20 C.F.R. §§ 404.1513(a)(d), 416.913(a)(d). In regard to Ms. Milano's joint pain, Dr. McCarthy's consultative examination found no "consistency on any rheumatologic basis for her pain" and "no complete records to describe any rheumatologic or musculoskeletal complaints other than fibromyalgia and depression." (224-25.) I find that substantial evidence supports the ALJ's determination that Ms. Milano's claims of arthritis lacked credibility.

_____

[15] *See* Lab Tests Online, http://www.labtestsonline.org/understanding/analytes/hla_b27/test.html.

[16] This record is incomplete. *See supra* note 6.

16

Finally, the ALJ's credibility determination was based on a finding that Ms. Milano tended to magnify her symptoms and to exaggerate the severity of her complaints. (*See* 44, 45.) I find only one medical record reflecting a provider's opinion that Ms. Milano had exaggerated her symptoms. Dr. McCarthy, the agency's consulting physician, noted that Ms. Milano "has an exaggerated response to pain in her left shoulder." (223.) The other records cited by the ALJ do not support a credibility determination on this basis. (*See* 179 (no mention of magnification or exaggeration), 190 (the nurse practitioner noted "pt difficult to assess" and "inconsistent exam"), 285 (patient described as "very dramatic about problem").) Furthermore, the remaining medical records relating to Ms. Milano's physical complaints provide no indication of symptom magnification or exaggerated claims. The ALJ's credibility determination with regard to Ms. Milano's claims of fibromyalgia is contrary to law and is not supported by substantial evidence. Accordingly, the case must be remanded for the Commissioner to reconsider Ms. Milano's claims of fibromyalgia in accordance with this opinion.

### Assessment of Severity of Mental Impairments

Ms. Milano argues that the ALJ's findings regarding her mental impairments are also contrary to law. These arguments appear to be directed at the ALJ's treatment of her mental impairments in his RFC determination in which he found that "[i]n spite of her mental impairments, Claimant is able to perform simple, routine jobs without special supervision." (44.) Ms. Milano contends that the ALJ erred in assessing the severity of her mental impairments by faulting her for not seeking consistent treatment, by finding that medication alleviated her psychological symptoms, and by substituting his opinion that Ms. Milano's symptoms are not as severe as she claims for the expertise of doctors who evaluated her. (*See* Doc. 24 at 13-15.)

The ALJ's consideration of Ms. Milano's inconsistent approach to treating her mental health

symptoms was not improper.  An ALJ may consider a claimant's failure to seek treatment when evaluating the severity of her mental impairments.  *See Foy v. Barnhart*, 139 F. App'x 39, 43 (10th Cir. 2005) (holding that "appellant's failure to avail herself of available therapeutic treatment is a legitimate factor to be considered in evaluating the severity of her alleged mental limitations."); *see also Schow v. Astrue*, 272 F. App'x 647, 650 (9th Cir. 2008) (finding that the ALJ properly rejected medical opinion that was not supported by treatment record where claimant had not sought treatment for depression or mental health counseling); *Gowell v. Apfel*, 242 F.3d 793, 798 (8th Cir. 2001) (holding that failure to seek recommended psychiatric treatment, coupled with extensive work history, supported ALJ's determination that mental impairments were not severe).  *But cf. Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989) (noting that "it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.")  Here, the ALJ noted at step two that Ms. Milano "stopped going to UNM for mental health care in late 2005 . . . [and] . . . did not seek specialized mental health care again until July 2007."  (42.)  Considering this "erratic approach to seeking mental health care . . . [he was] not persuaded that Ms. Milano's mental impairments are as severe as she claims."  (43.)

Nevertheless, I do not find substantial evidence to support the ALJ's assessment regarding the severity of Ms. Milano's mental impairments.  In addition to the inconsistent treatment record, the ALJ found that Ms. Milano "experienced significant improvement in her psychological symptoms and mental function" with treatment.  (42-43, 45.)  The medical records do not demonstrate the significant improvement the ALJ infers.  First, the ALJ relied in part on treatment records relating to Ms. Milano's physical complaints rather than mental health records.  (*See* 199 ("still crying, less depressed today"), 189 ("pain improved + depression on Zoloft Rx by MHC").)  These records are not from mental health care providers and say nothing about Ms. Milano's mental

function.  Second, the few mental health records cited by the ALJ are, at best, equivocal as to Ms. Milano's improvement.  For example, the therapist's notes from February 7, 2005 reflect that Ms. Milano was "doing better."  (321.)  However, the narrative portion indicates  "Pt says mood 'up + down', denies SI Active.  States had fleeting thought recently.  Denies current SI.  Still having some intrusive thoughts/nightmare about past abuse." (*Id.*)  The ALJ also cited UNM records from March 12, 2005.  On this occasion, Ms. Milano returned to PES stating that she had been thinking of suicide all night.  (328.)  On November 15, 2005, the therapist's notes reflect that Ms. Milano reported "things are going ok; feels meds are working well," but also reported "still with nightmares and . . . occ. crying spells." (308.)

Furthermore, in their entirety, Ms. Milano's mental health records reflect significant variation in her psychological symptoms from one visit to the next despite a steady increase both in dosage and in the number of medications prescribed to treat her mental symptoms.  Ms. Milano was first referred to UNM's Psychiatric Center in August 2004 with symptoms of depression and suicidal ideation.  (340.)  UNM therapists initially prescribed the anti-depressant Lexapro, which was later changed to Prozac, and then to Zoloft.  (*See* 326, 338, 345.)  In addition, Ms. Milano was placed on the sleep aid Trazodone, which was later replaced by Risperidone.  (338, 345.)  By December 2004 she reported sleeping well and feeling that Zoloft was more helpful than Prozac. (323.)  The therapist noted that Ms. Milano "report[ed] significant improvement with medication and with efforts to address effects of trauma." (*Id.*)  However, in January 2005 she described increased symptoms of PTSD and grief and the dosage of Zoloft was increased.  (322.)  In February her mood was "up and down" and she reported continued problems with insomnia and recent fleeting thoughts of suicide.  (321.)  By March Ms. Milano described worsening depression  and continued difficulty sleeping.  (320.)  The therapist again increased the dosage of Zoloft and

restarted Trazodone.  (*Id.*)  She returned to PES the next day after "thinking of suicide all night." (328.)  In mid-2005 after losing her job as a nurse's aide, the therapist's notes indicate that Ms. Milano was "doing moderately well" and that she felt her mood would improve once she found a job.  (318.)  However, in August she returned to PES and reported increased depression and tearfulness.  (313.)  The therapist increased the dosage of Risperidone, and added Wellbutrin "to help with [decreased] mood, and PTSD [symptoms]."  (314.)  In September Ms. Milano reported "good days and bad days."  (310.)  The therapist's notes from the last recorded visit to UNM in November 2005, indicate that "things are going okay, feels meds are working well" although she was still experiencing nightmares and occasional crying spells.  (308.)  They also indicate an increased dose of Wellbutrin.  (*Id.*)  In short, the mental health records cannot be characterized as showing significant improvement; rather, they reflect substantial variation in Ms. Milano's psychological symptoms and the effectiveness of her treatment from one visit to the next.

Finally, the ALJ relied on Ms. Stafford's October 15, 2007 letter in support of Ms. Milano's disability application.  (45.)  The letter indicates that Ms. Milano "responds well to behaviorally-oriented interventions and structured support" and "her overall levels of functioning and stability have clearly improved."  (435.)  However, the same letter states that "Ms. Milano is dealing with . . . major depression, chronic post-traumatic stress disorder, and borderline intellectual functioning."  (*Id.*)  Several months earlier, Ms. Stafford assessed Ms. Milano as markedly limited in numerous functional categories in a mental RFC questionnaire.  (*See* 429-433.)  The ALJ acknowledged Ms. Stafford's RFC report only to note that it was not from an acceptable medical source or a treating source.  (45.)  The ALJ's perfunctory dismissal of this record highlights a more fundamental error in his treatment of Ms. Milano's mental impairments.

After finding that Ms. Milano suffers from PTSD and depression at step two, the ALJ never

discussed the specific nature of Ms. Milano's mental impairments or Ms. Milano's allegations that she is limited due to problems with her memory, concentration, comprehension, and following instructions.  (*See* 95, 97.)  Rather, he suggested that he was hindered in his assessment by the absence of an opinion regarding the severity of Ms. Milano's impairments from an acceptable treating source. (44-45.) Ms. Stafford's RFC questionnaire addresses the severity of Ms. Milano's impairments with specific findings regarding Ms. Milano's functional limitations.   (426-34.) Without deciding whether Ms. Stafford is an acceptable medical source or a treating source, I note that, at the least, the report merits consideration "to show the severity of [Ms. Milano's] impairment(s) and how it affects [Ms. Milano's] ability to function."  *See* Soc. Sec. Rul 06-03p at *2.  Furthermore, the ALJ has a duty to develop the record.  *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997); 20 C.F.R. § 404. 1512(e); 20 C.F.R. § 416.912(e).  If he felt that Ms. Milano's mental health records were inadequate to determine the functional effects of Ms. Milano's mental impairments, he should have exercised this duty.  *See* 20 C.F.R. § 404. 1512(e), (f) (describing the actions the agency will take when the record evidence from a treating physician, psychologist or other medical source is inadequate to determine whether a claimant is disabled); *see also Maes v. Astrue*, 522 F.3d 1093, 1097-98 (10th Cir. 2008) (noting that an ALJ generally must re-contact a claimant's medical sources for additional information when the record is inadequate to determine whether the claimant is disabled).

Moreover, "[w]hen there is evidence of a mental impairment that allegedly prevents a claimant from working, the ALJ must follow the procedure for evaluating mental impairments set forth in 20 C.F.R. § 404.1520a and the Listing of Impairments and document the procedure accordingly."  *Carpenter*, 537 F.3d at 1268 (internal citations omitted); *see also* 20 C.F.R. § 416.920a.  "This procedure requires the ALJ to 'rate the degree of the claimant's functional

limitation based on the extent to which the claimant's mental impairment(s) interferes with the claimant's ability to function independently, appropriately, effectively, and on a sustained basis.'" *Id.* (citing 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).)   The ALJ is required to "document application of the technique in the decision."  *Id.* (citing 20 C.F.R. §§ 404.1520a(e), 416.920a(e).) "The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section."  20 C.F.R. § 404.1520a(e)(2); see also 20 C.F.R. § 416.920a(e)(2).  Here, the ALJ made no specific findings regarding the nature and degree of Ms. Milano's mental impairments.  Although her failure to seek treatment from late 2005 to mid-2007 raises questions regarding the severity of her mental complaints, the available mental health records do not demonstrate significant improvement with treatment as the ALJ suggested.  Without specific findings and discussion from the ALJ regarding the functional limitations of Ms. Milano's mental impairments, his determination that she can perform "simple, routine jobs, without special supervision" had no basis.  I find that the ALJ's RFC determination is not supported by substantial evidence.  Accordingly, this matter must be remanded for the Commissioner to reconsider the severity of Ms. Milano's mental impairments in accordance with this opinion.[17]

Ms. Milano also argues that the ALJ erred at step five by conclusively applying the grids to direct a finding of not disabled.  Because I find that the ALJ erred in the treatment of Ms. Milano's

---

[17] Because Ms. Milano's motion to remand focuses on the ALJ's treatment of her mental impairments in his RFC finding, I limit my decision to step four.  However, I note that the ALJ's evaluation at step three appears to be plagued by similar problems as his evaluation at step four.  For example, the ALJ indicated that he was "unable to compare the severity of Ms. Milano's mental impairments against the functional criteria in Listings 12.04B-C and 12.06B-C" because there are "no records of psychotherapeutic counseling in the mental health treatment record."  (44.)  Here, again, the ALJ failed to consider the RFC report from Ms. Stafford and failed to develop the record.  *See* Soc. Sec. Rul 06-03p at *2; *Hawkins*, 113 F.3d at 1164; *see also* 20 C.F.R. § 404. 1512(e), (f); 20 C.F.R. § 416.912(e), (f).  Accordingly, nothing in this order precludes the Commissioner from returning to step three to evaluate the functional limitations of Ms. Milano's mental impairments and compare them to the applicable Listings at 20 C.F.R. Part 404, Subpart P, Appendix 1 in light of Ms. Stafford's report and any additional record evidence developed by the Commissioner.

mental impairments in his RFC finding at step four, I need not decide whether he also erred at step

five. However, I note that the grids cannot be applied to direct a disability determination unless a

claimant can "perform the full range of work required of that category on a daily basis and unless

the claimant possesses the physical capacities to perform most of the jobs in that range." *Hargis v.*

*Sullivan*, 945 F.2d. 1482, 1490 (10th Cir. 1991). "[R]esort to the grids is particularly inappropriate

when evaluating nonexertional limitation such as pain and mental impairments." *Id.* "Where a

person has nonexertional [ ] limitations, the ranges of work he or she can perform (sedentary to very

heavy) are diminished by exclusion of the particular occupations or kinds of work within those

ranges that entail use of the abilities which the person has lost." *Channel v. Heckler,* 747 F.2d 577,

580 (10th Cir. 1984) (citing 43 Fed. Reg. 55,349, 55,358). In such cases, "the grids may serve only

as a framework to determine whether sufficient jobs remain within the claimant's range of residual

functional capacity." *Thompson*, 987 F.2d at 1488 (citing *Hargis*, 945 F.2d at 1490). To

complement this framework, an ALJ must consider vocational evidence, including the testimony

of a vocational expert, regarding the existence of jobs in the national economy which the claimant

can perform despite her restrictions. *See Thompson*, 987 F.2d at 1492-93 (remanding for expert

vocational testimony on the impact of claimant's impairments on her ability to work within the RFC

category); *see also Gutierrez v. Barnhart*, 109 F. App'x 321, 328 (10th Cir. 2004) (remanding for

vocational expert testimony "about plaintiff's ability to perform specific light jobs that may exist in

significant numbers in the national economy"); Soc. Sec. Rul. 83-12, 1983 WL 31253 at *2

(advising use of vocational expert at step five of sequential analysis when claimant's RFC does not

precisely fit any exertional category).

## CONCLUSION

For the reasons set forth above, Ms. Milano's Motion to Reverse and Remand for a

Rehearing is granted and this matter is remanded for further proceedings consistent with this opinion.

IT IS SO ORDERED.

WILLIAM P. LYNCH
UNITED STATES MAGISTRATE JUDGE

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any *pro se*
party as they are shown on the Court's docket.